UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
BIC CORPORATION and BIC USA INC.,

                            Plaintiffs,

            v.

FIRST WHOLESALE INC.; MEI YOU; JOHN DOE
COMPANIES 1-10; and JANE OR JOHN DOES 1-10,

                            Defendants.
------------------------------------------------------------------------x

**TEMPORARILY**
**SEALED**

**REPORT AND**
**RECOMMENDATION**

25-CV-4892
(Kovner, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

On September 3, 2025, Plaintiffs BIC Corporation and BIC USA Inc. (collectively,

"BIC") commenced this action against Defendants First Wholesale Inc. and Mei You

(collectively, "Defendants"), as well as John Doe Companies 1-10 and Jane or John Does 1-10,

raising Lanham Act claims of federal trademark counterfeiting; federal trademark infringement;

federal unfair competition and false designation of origin; contributory trademark infringement;

and federal trademark dilution, as well as a claim of New York State trademark dilution, injury

to business reputation, and a common law claim of trademark infringement and unfair

competition. *See* Dkt. No. 1. At the time of filing, BIC also sought the entry of an *ex parte*

temporary restraining order ("TRO"); an order authorizing *ex parte* relief, including seizure of

counterfeit goods under 15 U.S.C. § 1116(d); an order to show cause for a preliminary injunction;

an order for a temporary asset freeze; and an order permitting expedited discovery (collectively,

the "TRO Application"). *See* Dkt. No. 5.

On September 15, 2025, the Court granted, in part, the TRO Application. *See* Dkt. No.

10. After Defendants appeared in this action and sought a reduction in the monetary amount

subject to the asset freeze (Dkt. No. 21), and after an October 14, 2025 status conference and proposed order submitted by the parties (Dkt. No. 31), the Court modified its September 15, 2025 asset freeze order on October 16, 2025. *See* Dkt. No. 32 (the "Asset Freeze Order"). Specifically, per the Asset Freeze Order, the Court unfroze, in full, Defendants' accounts at ██████████ and lifted the asset freeze that previously applied to said accounts. *See id.* at 1.[1] The Court also ordered that Defendants' account at ████████ be frozen in the amount of $140,934 (the "Frozen Amount"), with Defendants restrained from secreting, transferring, or conveying any of the frozen funds until further order of this Court. *See id.* at 1-2. The Court added that "[t]he bank, brokerage house, or financial institution holding the frozen funds is restrained from releasing them until further order of this Court." *Id.* at 1. The Court noted that "[a]ll of Defendants' assets and proceeds at ███████ exceeding this Frozen Amount are hereby **underfrozen**." *Id.* at 2 (emphasis in original). The Court then directed Defendants to file supplemental briefs discussing the appropriate measure of Defendants' profits, with BIC permitted to respond. *See* Minute Entry & Order dated Oct. 14, 2025.

Currently before the Court, on a referral from the Honorable Rachel P. Kovner, United States District Judge, is Defendants' supplemental application concerning how to appropriately calculate Defendants' profits or losses for purposes of further modifying the Court's Asset Freeze Order. *See* Dkt. No. 49; Text Order dated Nov. 13, 2025. For the reasons set forth below, the undersigned respectfully recommends that Defendants' application be granted in part and denied in part.

In an abundance of caution, the undersigned temporarily enters this Report and Recommendation under seal. The parties shall file a letter attaching targeted and narrowly

---

[1] Page citations to docketed memoranda or filings are to the ECF-stamped page.

tailored redactions (if any) to this Report and Recommendation by January 2, 2026. The undersigned adds that, pursuant to Part XII of the undersigned's Individual Practices and Rules, "[a]ny application to seal shall be accompanied by an affidavit or affidavits and a memorandum of law, demonstrating that the standards for sealing have been met and specifically addressing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)." The undersigned notes, however, that the entire Report and Recommendation will not be sealed under any circumstances.[2]

## I.    <u>Relevant Background</u>

Familiarity with the facts of this matter is presumed for purposes of this Report and Recommendation. The undersigned, however, notes the most pertinent filings and allegations below.

In their October 9, 2025 filing, Defendants did "not challenge the entry of a preliminary injunction in this matter on non-willful trademark infringement grounds," but argued that the asset freeze amount should be reduced. Dkt. No. 21 at 4. Defendants argued that "[a]lthough this

---

[2] Indeed, on November 3, 2025, Judge Kovner denied Defendants' prior request to electronically file a document under seal, noting that:

> "The public and the press have a qualified First Amendment right to . . . access certain judicial documents." [*Lugosch*, 435 F.3d at 120] (citation and quotations omitted). Although judicial documents "may be kept under seal if . . . 'higher values' . . . so demand," *id.* at 124, such restrictions require "specific, on the record findings" that "closure is essential to preserve higher values and is narrowly tailored to serve that interest," *id.* at 120 (quotations omitted).

> Defendants have not established a basis for sealing the entire motion and all attached exhibits. Their statement that public disclosure could expose "non-public sensitive details regarding Defendants' commercial operations, customers, personal and business finances," Letter (Dkt. #33), does not establish that sealing the motion and exhibits in their entirety "is essential to preserve higher values and is narrowly tailored to serve that interest," *Lugosch*, 435 F.3d at 120. Defendants are directed to file a more limited sealing request proposing redactions to references to defendants' personal finances, as well as commercial operations unrelated to the sales of allegedly counterfeit BIC lighters, by 11/7/2025.

Text Order dated Nov. 3, 2025. Judge Kovner ultimately permitted portions of the record under seal following further briefing by Defendants. *See* Sealed Order dated Nov. 10, 2025 (granting Dkt. No. 45).

Court has discretion to freeze the assets of an alleged counterfeiter under the Lanham Act, such an asset freeze should be confined in scope to the likely *profits* gained from the counterfeiting activity." *Id.* at 8. Defendants argued that "[c]ourts within the Second Circuit have established that asset freezes in Lanham Act cases should be confined to preserving the equitable remedy of an accounting for profits." *Id.* (citing *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-CV-6283 (AJN), 2012 WL 5265727, at *4 (S.D.N.Y. Oct. 24, 2012)). Defendants asserted that "freezing Defendants' personal and business assets [has] caus[ed] an enormous hardship to Defendants, who cannot currently undertake its commercial operations." *Id.* at 9. Defendants further argued that the total cost of their BIC-branded pocket lighters was $43,530. *Id.* at 5 (citing Affirmation of Defendant You, Dkt. No. 21-1 ¶¶ 6-7).

In response, BIC argued that "Defendants' 'profits' under the Lanham Act are considered equal [to] [Defendants'] revenue from the infringing sales, i.e., at least $46,978." Dkt. No. 23 at 13. BIC submitted that, when trebled under the Lanham Act for willful counterfeiting and infringement, the total amount is $140,934—"the minimum amount that is necessary to secure BIC's right to an equitable accounting of Defendants' profits." *Id.* at 10.

Following Defendants' submission and a hearing with all parties present, on October 16, 2025, the Court entered the Asset Freeze Order. Dkt. No. 32.

On October 16, 2025, Defendants filed its supplemental brief discussing the appropriate measure of Defendants' profits in connection with its request to modify the Asset Freeze Order. *See* Dkt. No. 33 (under seal); Dkt. No. 49 (unredacted); *see also* Dkt. No. 50 (Supplemental Affirmation of Defendant You). Defendants first argue that treble damages are a statutory, not equitable, remedy and therefore not a proper basis for calculating an asset freeze. *See* Dkt. No. 49 at 4-6. Defendants also contend that the Asset Freeze Order should be reduced to an equitable

4

accounting of profits. *See id.* at 6-8. Defendants proffered that, "[i]n accordance with *Klipsch*, the starting point (but not ending point) for this asset freeze calculation should thus be the amount of Defendants' sales, which is either $43,198 or $46,978 (the parties' two competing numbers, the lower number being the amount that Defendants have substantiated via the information and materials included in [Defendant You's affirmations])"; "[f]rom this amount, the Court should then deduct Defendants' costs and other deductions associated with the allegedly counterfeit BIC lighters to arrive at Defendants' total profits or loss, this being the proper amount for the prejudgment asset freeze (again, without any subsequent trebling or other statutory-based increase)." *Id.* at 6.

In terms of calculations, Defendants argue that the direct costs Defendants paid for all of the BIC lighters at issue ($43,530) should be deducted from Defendants' total sales of $43,198 to account for Defendants' profits. *See id.* at 7. Since that calculation results in a loss of $332, Defendants submit that there should be no asset freeze at all. *See id.*

At the same time, given BIC's position that Defendants should not be permitted to deduct their costs for seized BIC lighters when calculating Defendants' profits or losses, Defendants submit an alternative calculation. *See id.* at 7-8. As Defendants contend that their total costs were $43,530, and as Defendants contend that the "costs for the BIC lighters that they sold (not including the seized items) would be $36,851.75," then the maximum profits for Defendants would be $6,678.25. *Id.* at 8. Thus, Defendants contend that the asset freeze should be reduced to, at most, $6,678.25. *Id.*

On October 22, 2025, BIC asserted that Defendants' infringing sales total $46,978 based on Defendants' own sales and inventory records. *See* Dkt. No. 39-5 (under seal); Dkt. No. 46 (unredacted) at 5. BIC further argues that Defendants "fail[ed] to meet their burden of adequately

identifying costs to deduct from sales." Dkt. No. 46 at 5.  BIC adds that the Court should continue to treble damages.  *See id.* at 11-13.

Defendants filed a reply in further support of its application on October 23, 2025.  *See* Dkt. No. 40 (under seal); Dkt. No. 51 (unredacted).

On November 13, 2025, Judge Kovner referred Defendants' application for modification of the Asset Freeze Order to the undersigned for a report and recommendation.  *See* Referral Order dated Nov. 13, 2025.

On December 3, 2025, the parties participated in a status conference before the undersigned.  *See* Minute Entry dated Dec. 3, 2025.  During the conference, the parties discussed potential settlement off the record, but a resolution was not able to be reached with regard to Defendants' application to further modify the Court's Asset Freeze Order, or as to the matter generally.  *Id.*  The Court ordered additional briefing regarding its positions.  *Id.*

On December 8, 2025, Defendants filed a letter in further support of its application to modify the Asset Freeze Order, responding to BIC's statements and authority cited during the December 3, 2025 conference and requesting a modification of the Asset Freeze Order to no more than $10,126 in frozen assets, which Defendants now contend "is the most favorable profits calculation that BIC could reasonably present."  *See* Dkt. No. 57.

On December 12, 2025, BIC filed a letter in response to Defendants' filing, maintaining that the Asset Freeze Order should not be further modified.  *See* Dkt. No. 58.

## II.   <u>Discussion</u>

### A.   **Legal Standard**

Under the Lanham Act, a plaintiff who establishes a violation of its rights in connection with a registered trademark is entitled to recover a defendant's profits.  *Gilead Scis., Inc. v. Safe*

*Chain Sols., LLC*, 684 F. Supp. 3d 51, 62 (E.D.N.Y. 2023) (citing 15 U.S.C. § 1117(a); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014)).  "[T]he Court unquestionably has authority to freeze assets to preserve an equitable accounting of profits."  *Id.* (quoting *Klipsch Grp.*, 2012 WL 5265727, at *4); *see also Tiffany (NJ) LLC, v. China Merchs. Bank*, 589 F. App'x 550, 552 (2d Cir. 2014) ("In accordance with our holding in *Gucci*—and well settled Supreme Court precedent—a claim for an accounting of profits under the Lanham Act is equitable in nature.  Therefore, the district court had the equitable authority to issue a prejudgment asset freeze in this case.").  "[S]uch a freeze should be confined in scope to the likely *profits* of counterfeiting activity."  *Klipsch Grp.*, 2012 WL 5265727, at *5.  It may not be used to preserve funds that "may later be used to satisfy an award of statutory damages."  *Gilead Scis.*, 684 F. Supp. 3d at 71 (quoting *Spin Master v. Aciper*, No. 19-CV-6949 (VSB), 2020 WL 6482878, at *3 (S.D.N.Y. Nov. 4, 2020)).

    "A party seeking to lift an asset freeze order that has already been entered as a preliminary injunction has the burden of 'present[ing] documentary proof that particular assets are not the proceeds of counterfeiting activities.'"  *Id.* at 63 (quoting *Ideavillage Prod. Corp. v. Bling Boutique Store*, No. 16-CV-9039 (KMW), 2017 WL 1435748, at *6 (S.D.N.Y. Apr. 21, 2017)); *see also Klipsch Grp.*, 2012 WL 5265727, at *8 ("a court 'may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity.' 'The burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.'" (quoting *N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-CV-9083 (RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006))).

### B.    Analysis

#### i.    Defendants' Profits

Under the Lanham Act, "[a] plaintiff seeking an accounting of profits is 'required to prove defendant's sales only. . . . And then the burden shifts to the defendants to 'prove all elements of cost or deduction.'"  *Gilead Scis.*, 684 F. Supp. 3d at 71 (quoting *Gucci Am.*, 768 F.3d at 133); *see also* 15 U.S.C. § 1117(a) ("the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed").  Claimed costs include the purchase cost of the goods sold, which are then deducted from the total sales to determine profits. *See Fendi Adele S.r.l. v. Ashley Reed Trading, Inc.*, No. 06-CV-243 (RMB) (MHD), 2010 WL 11586410, at *15 (S.D.N.Y. Aug. 12, 2010) ("for the amounts they seek to deduct, defendants must show that 'the costs were related to the production, distribution or sale of the infringing product'" (quoting *Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware, Inc.*, No. 06-CV-12988, 2009 WL 5173920, at *7 (S.D.N.Y. Dec. 30, 2009))).

#### a.    Total Sales

First, as noted above, BIC has demonstrated that Defendants' sales of such lighters totaled at least $46,978, as demonstrated by a summary of Defendants' relevant sales orders collected by BIC's forensic investigators during the September 25, 2025 seizure.  *See* Dkt. No. 25 ¶ 8; Dkt. No. 27-5 at 4, 7-15.  Defendants, however, claim their sales of such lighters totals only $43,198 based on "business records kept in the ordinary course" and Defendant You's "good faith research and diligence to date."  *See* Dkt. No. 21-1 ¶ 8; Dkt. No. 50 ¶ 6; Dkt. No. 50-2.  The documents upon which Defendants primarily rely to support the $43,198 in sales include excerpts from "First Wholesale's electronic sales and inventory records," and a "comprehensive list of all sales that [Defendants] have in [their] system based on searching the applicable product numbers in [their]

system (namely, 'KI48298' for the large BIC Maxi lighter, and 'C-987887' for the smaller BIC Mini lighter)."[3]  Dkt. No. 50 ¶¶ 7, 8; Dkt. No. 50-2 at 2, 4-12.

Defendants note that in their "comprehensive list," "these output pages do not include the specific price and quantity for each order," so Defendant You "included [her] own handwritten annotations on these pages documenting the amount that First Wholesale received for each order and the number of packs [of BIC lighters] purchased."  Dkt. No. 50 ¶ 9.  But, as BIC points out, this list contains "errors that are either plain on their face (e.g., arithmetic errors) or are contradicted by evidence from Defendants' Database (missing orders, inaccurate pricing, or wrong quantities)."  Dkt. No. 46 at 9.  For instance, Defendants' handwritten records show that Order No. 57910 was for "2pk x $42 = $42."  Dkt. No. 50-2 at 5.  BIC's evidence, pulled from Defendants' database, shows that the invoice for Order No. 57910 included two packs at $42 each, for a total of $84.  Dkt. No. 55 ¶ 14; *id.* at 23.  Similarly, Defendants' handwritten records purport that Order No. 48306 was for "3pk x $42 = $42."  Dkt. No. 50-2 at 6.  BIC's evidence, however, shows that the invoice for Order No. 48306 included three packs at $42 each, totaling $126.00.  Dkt. No. 55 ¶ 17; *id.* at 32.

In addition to these arithmetic errors, Defendants' records contain errors as to how many packs were sold.  For instance, Defendants' handwritten records show that one pack was sold for $38 in Order No. 42977 (Dkt. No. 50-2 at 8) but BIC demonstrates that Order No. 42977 actually contained twelve packs for $38 each, totaling $456.  Dkt. No. 55 ¶ 13; *id.* at 15.

---

[3] Defendants state that, in their records, these product numbers now correspond to other products, specifically Super Clear Tape and Silicone Snaps, because they reassigned the product numbers used for the lighters at issue "when the seizure began," as it is their "usual practice to reassign numbers when the prior product will no longer be sold."  Dkt. No. 50 ¶ 19.

Furthermore, while the "electronic sales and inventory records" appear to show that Defendants' records account for $43,198.80 in sales, as they now assert, these totals are derived from the aforementioned "comprehensive list of sales," and since BIC has shown that such a list contained, at the very least, inaccurate information, the Court should not credit Defendants' assertions over the total sales demonstrated by BIC's evidence, which BIC derived from Defendants' own business records.  Courts in this Circuit have held that if "the actual sales cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate record-keeping or failure to produce documentary evidence." *Chloe v. Zarafshan*, No. 06-CV-3140 (RJH) (MHD), 2009 WL 2956827, at *5 (S.D.N.Y. Sep. 15, 2009) (quoting *Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*, No. 87-CV-890 (RO), 1989 WL 236526, at *5 (S.D.N.Y. Sep. 22, 1989)). "Indeed, in such a situation it is permissible to award the highest reasonably ascertainable amount of profits." *Aris Isotoner*, 1989 WL 236526, at *5 (citing *Chesa Int'l, Ltd. v. Fashion Assocs., Inc.*, 425 F. Supp. 234, 238 (S.D.N.Y. 1977)).

Therefore, at this stage, the undersigned respectfully recommends that the Court look to BIC's calculations and conclude that Defendants' relevant sales totaled $46,978.

**b.    Total Costs**

Defendants argue that their costs, deductible from sales, should include the purchase cost of all counterfeit BIC lighters they purchased, regardless of whether such lighters were sold to customers or seized by BIC on September 25, 2025.  *See* Dkt. No. 49 at 7-8.  Specifically, Defendants claim that they possessed a total of approximately 1,434 packs of lighters, which they purchased for a total cost of $43,530 over eight transactions between August 13, 2024 and June 20, 2025.  Dkt. No. 21-1 ¶¶ 6, 7, 10; Dkt. No. 50 ¶¶ 2, 3.  Defendants claim they sold only 1,214

10

packs, and that 220 packs were seized in connection with this lawsuit. *See* Dkt. No. 21-1 ¶¶ 9, 10; Dkt. No. 50 ¶¶ 5, 10. They assert that profits should be calculated by deducting their total costs for all 1,434 packs of lighters—$43,530—from their total sales, rather than deducting just the costs for the 1,214 packs actually sold, which, according to Defendants, would constitute at least $36,851.75 in costs. Dkt. No. 50 ¶¶ 5, 11.

BIC asserts that no costs should be deducted from Defendants' sales because Defendants have not met their burden to prove costs incurred for the counterfeit lighters Defendants sold. *See* Dkt. No. 46 at 11; Dkt. No. 58 at 2-3. BIC also argues that, even if the Court finds that Defendants sufficiently set forth their costs and deducts such costs from Defendants' sales to determine profits for purposes of modifying the Asset Freeze Order, the Court should use a per-unit of sold goods cost calculation, such that the cost of unsold inventory (the seized items) is excluded. *See* Dkt. No. 46 at 6-7. BIC further disputes Defendants' representations of the numbers of counterfeit lighters Defendants purchased and sold and that were seized, which may impact the cost calculation. *See* Dkt. No. 23 at 12; Dkt. No. 46 at 8 n.3; Dkt. No. 58 at 3.

As an initial matter, for the reasons discussed in reference to Defendants' total sales, *supra*, the undersigned finds that Defendants sold at least 1,310 packs/trays of counterfeit BIC lighters.[4] Dkt. No. 23 at 12; Dkt. No. 27-4 ¶¶ 53-58; *id.* at 61-68; Dkt. No. 27-5 at 7-15. The undersigned also finds that Defendants' deductible costs include only the costs for the goods they actually sold. In other words, profits should be calculated using the total sales figure and the demonstrated total costs for those sold items only. *See Koninklijke Philips N.V. v. 10793060*

---

[4] Although BIC sets forth that Defendants also sold 200 individual lighters for $0.95 to $1.00 each, constituting four additional trays, Dkt. No. 27-4 ¶¶ 53-58; *id.* at 61-68, BIC did not include the sales from the individual lighters in their proposed estimation of Defendants' sales, which accounted only for the trays/packs sold and totaled $46,978.

*Canada Inc.*, No. 21-CV-1910 (AMD) (AYS), 2023 WL 2815721, at *4 (E.D.N.Y. Feb. 22, 2023) (calculating profits "per each counterfeit unit sold"), *report and recommendation adopted*, 2023 WL 2662280 (E.D.N.Y. Mar. 28, 2023); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 319-20 (E.D.N.Y. 2009) (noting that, in calculating defendants' profits on counterfeit hoisin sauce, "[t]he amount paid by defendants for sauce that was seized was not deducted from their sales revenues"); *MPD Accessories B.V. v. Urb. Outfitters*, No. 12-CV-6501 (LTS) (KNF), 2014 WL 2440683, at *8 (S.D.N.Y. May 30, 2014) (in copyright infringement action, calculating costs by multiplying the average cost "per unit" by the number of infringing items "actually sold"); *New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (infringer should offer "evidence as to the costs of goods sold"). Defendants have not set forth any support for their contention that profits are offset by the costs of Defendants' unsold merchandise. Thus, to determine Defendants' profits, the undersigned will deduct from Defendants' sales only the costs for the approximately 1,310 packs Defendants sold.

As to the actual costs demonstrated by Defendants, Defendants claim their total costs for 1,434 packs[5] of counterfeit BIC lighters were $43,530. *See* Dkt. No. 21-1 ¶¶ 6, 7, 10; Dkt. No. 50 ¶¶ 2, 3, 5. They assert that they made eight transactions between August 13, 2024 and June 20, 2025. Dkt. No. 21-1 ¶¶ 6, 7, 10; Dkt. No. 50 ¶¶ 2, 3. In support of their alleged total costs, Defendants submitted "business records kept in the ordinary course." Dkt. No. 50 ¶ 3; Dkt. No. 50-1. These documents include:

> (1)    an undated handwritten order showing a purchase of sixty packs of lighters for $35 each ($2,100 total), Dkt. No. 50-1 at 2;

---

[5] BIC claims Defendants actually purchased at least 1,470 packs. Dkt. No. 23 at 12; Dkt No. 58 at 3.

(2)    a handwritten order dated December 28, 2024, showing a purchase of 120 packs of lighters for $25 each ($3,000 total), *id.* at 3;

(3)    a handwritten order dated April 9, 2025, showing a purchase of 120 packs of lighters for $35 each ($4,200 total), *id.* at 4;

(4)    a handwritten order dated April 10, 2025, showing a purchase of 126 packs of lighters for $33 each ($4,158 total), *id.* at 5;

(5)    a handwritten order dated April 28, 2025, showing a purchase of 240 packs of lighters for $25 each ($6,000 total), *id.* at 6;

(6)    a First Wholesale Inc. check dated June 20, 2025 and made out to Khirshin USA Business War LLC ("Khirshin") for $21,252, *id.* at 7;

(7)    a screenshot of Defendants' purchase order database showing a purchase on January 22, 2025 for sixty units at a total price of $2,100, in addition to the aforementioned April 9, 10, and 28, 2025 purchases, as well as one from August 13, 2024 for $2,100, which is presumably the aforementioned undated order, *id.* at 8; and

(8)    a sales order form showing a purchase of 168 packs of lighters for $30 each ($5,040 total), *id.* at 9.

Purchases (1) through (7) were made from Khirshin, and purchase (8) was made from OVC Smoke Distributors Co. ("OVC"). *See* Dkt. No. 50 at 2-3; Dkt. No. 50-1. Defendants noted that they subsequently returned 144 packs to OVC and received a refund of $4,320. Dkt. No. 50 at 3. Accordingly, Defendants' costs for lighters purchased from OVC totals $720. *Id.*

The aforementioned documents submitted by Defendants, as well as the Supplemental Affirmation of Defendant You, support Defendants' assertions that purchases (1) through (5), (7), and (8) constitute costs related to counterfeit BIC lighters totaling $22,278 for 750 packs. *See* Dkt. No. 50-1 at 2-6, 8, 9. The documents demonstrate purchases for lighters[6] at prices between $25 and $35 per pack. *Id.*

---

[6] Although the screenshot showing purchase (7) does not state that lighters were purchased from Khirshin in the January 22, 2025 order, the purchase price of $2,100 for sixty units is in line with other purchases for these items from Khirshin made by Defendants. *See* Dkt. No. 50-1 at 8.

The document supporting purchase (6), however, is simply a copy of a check made out to Khirshin, without anything written on the memo line. *Id.* at 7. It is therefore unclear whether this check constituted a payment for counterfeit BIC lighters, in whole or in part. Without additional documentation to support what items were purchased with the $21,252 check made out to Khirshin, the Court should not accept Defendants' contention that the entire payment constituted costs for lighters at issue in this litigation. Defendants "must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). "[F]or the amounts they seek to deduct, defendants must show that 'the costs were related to the production, distribution or sale of the infringing product.'" *Fendi Adele S.r.l.*, 2010 WL 11586410, at *15 (quoting *Nat'l Envelope Corp.*, 2009 WL 5173920, at *7). Defendants have not done that here, because their proffered copy of a check made out to Khirshin, accompanied by Defendant You's contention that Defendants made a $21,252 purchase from Khirshin in June 2025 "to fulfill the fourth and final order from Plaintiffs' investigator," Dkt. No. 50 ¶ 4, does not demonstrate that the entirety of the $21,252 constitutes costs related to counterfeit BIC lighters purchased by Defendants. Defendants have set forth no other evidence to support their assertion that the comparatively large order that Defendants paid Khirshin for with the June 20, 2025 check consisted solely of counterfeit BIC lighters. Accordingly, these alleged costs should not be included in the determination of Defendants' profits.

Therefore, purchases (1) through (5), (7), and (8) constitute costs related to counterfeit BIC lighters and total $22,278 for 750 packs. Although Defendants sold 1,310 packs, they have demonstrated costs only as to 750 packs, consisting of $22,278. Since these costs relate to only 750 packs, less than the number that Defendants sold, the undersigned need not deduct from this number any additional costs relating to unsold and/or seized goods.

As to costs, the undersigned respectfully recommends that the Court find that the evidence set forth by the parties at this stage demonstrates that Defendants' costs for their sold-counterfeit BIC lighters was $22,278.

### c.    Total Profits

As BIC has demonstrated at least $46,978 in sales and Defendants have demonstrated at least $22,278 in costs, the undersigned recommends, for purposes of modifying the Asset Freeze Order, profits of $24,700.

### ii.    Defendants' Profits Should Not Be Trebled for Purposes of the Asset Freeze

"Under the Lanham Act, an asset freeze 'must be limited to an amount sufficient to preserve the equitable claim and may not be used to preserve funds that may later be used to satisfy an award of statutory damages.'" *Gilead Scis.*, 684 F. Supp. 3d at 71 (quoting *Spin Master*, 2020 WL 6482878, at *3). When a court finds that a violation of the Lanham Act was intentional, "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages [as determined by 15 U.S.C. § 1117(a)], whichever amount is greater." 15 U.S.C. § 1117(b). The court, "in its discretion," may award up to three times a plaintiff's actual damages where it finds that "the amount of the recovery based on profits alone is either inadequate or excessive." *Ghost L.L.C. v. Ghost Fitness NYC, LLC*, No. 21-CV-3557 (NCM) (MMH), 2025 WL 2487826, at *13 (E.D.N.Y. Aug. 29, 2025), *report and recommendation adopted*, 2025 WL 2772887 (E.D.N.Y. Sep. 26, 2025) (citing 15 U.S.C. § 1117(a)). "The Court must treble damages upon a finding of willfulness, absent extenuating circumstances." *Id.* (citing § 1117(b)). But even "when a plaintiff sustains its burden of proving willfulness, courts should consider not only whether an enhanced profits award is appropriate, but also whether the disgorgement of *all* profits attributable to the infringing product is necessary to achieve the

15

desired deterrent effect." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 214 (2d Cir. 2019) ("[W]hen relying on the deterrence rationale to support an award of an infringer's profits in the absence of any evidence of actual confusion, district courts should attend closely to the need to fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall.").

BIC argues that such treble damages are equitable in nature, and, accordingly, treble profits are subject to an asset freeze. Dkt. No. 46 at 11-13; Dkt. No. 58 at 3-5. Defendants argue that treble damages under the Lanham Act are a statutory remedy rather than an equitable remedy and thus are not subject to an asset freeze. Dkt. No. 49 at 4-6; Dkt. No. 51 at 4-6; Dkt. No. 57 at 1-3. The undersigned agrees with Defendants that treble profits are not equitable, and respectfully recommends that Defendants' profits *not* be trebled for purposes of modifying the Asset Freeze Order.

Where a prejudgment asset freeze is not specifically authorized by statute, a court retains the authority to issue such an asset freeze "where such relief <u>was</u> traditionally available: where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief." *Dong v. Miller*, No. 16-CV-5836 (NGG) (JO), 2018 WL 1445573, at *7 (E.D.N.Y. Mar. 23, 2018) (quoting *Gucci Am.*, 768 F.3d at 131). "[D]istrict courts have no authority to issue a prejudgment asset freeze pursuant to Rule 65 where such relief was not 'traditionally accorded by courts of equity.'" *Gucci Am.*, 768 F.3d at 131 (quoting *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999) (Scalia, J.)); *see also Dong*, 2018 WL 1445573, at *7 ("To ascertain whether a plaintiff seeks 'equitable' relief, the court considers both whether the claim is one that would have been heard in equity prior to the merger of law and equity, and whether the plaintiff seeks relief traditionally understood as equitable."

16

(citation omitted)).  In considering the question of whether a district court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no equitable interest is claimed, the United States Supreme Court has emphasized its long history of abiding by the principle that "the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence."  *Grupo Mexicano*, 527 U.S. at 332.  The Judiciary Act of 1789 conferred on federal courts jurisdiction "to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries."  *Id.* at 318 (quoting *Atlas Life Ins. Co. v. W.I. S. Inc.*, 306 U.S. 563, 568 (1939)).  The Supreme Court expressed that "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73))."  *Id.* (citation omitted).  Thus, in *Grupo Mexicano*, the Supreme Court held that the district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages" because "such a remedy was historically unavailable from a court of equity."  *Id.* at 333.

If such relief—specifically, treble damages—was not traditionally available in the courts of equity, it is not equitable in nature and cannot be subject to an asset freeze pending adjudication of BIC's action brought under the Lanham Act.  *See Gucci Am.*, 768 F.3d at 131.  Judge Alison J. Nathan's opinion in *Klipsch Group*, 2012 WL 5265727, is instructive.  In *Klipsch Group*, the court did not explicitly consider whether treble damages under 15 U.S.C. § 1117(b) are equitable and subject to an asset freeze.  *See id.*  It did, however, consider whether other claimed statutory damages available under the Lanham Act may be included in an asset freeze.  *Id.* at *5-10.  The

court expressed that "such a freeze should be confined in scope to the likely *profits* of counterfeiting activity." *Id.*  Indeed, "statutory damages under the Lanham Act still constitute legal damages based on . . . the 'general rule' that 'monetary relief is legal and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment.'" *Id.* at *6 (quoting *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998)).  The court concluded that, "[b]ecause the Court has determined that statutory damages would not have been a remedy available in courts of equity, *Grupo Mexicano* therefore precludes a freeze of assets for the purpose of preserving an award of statutory damages." *Id.* at *8; *cf. Wright v. Edwards*, No. 21-CV-6063 (PKC) (RLM), 2022 WL 17820247, at *11 (E.D.N.Y. July 18, 2022) ("Statutory damages are considered a remedy at law, not in equity; as such, where the plaintiff has elected statutory damages (as is the case here), there is no basis for the Court to impose a post-judgment asset freeze.").  At bottom, the court found that "every decision of which the Court is aware has concluded that statutory damages under the Lanham Act are a remedy at law, not one at equity." *Klipsch Grp.*, 2012 WL 5265727, at *6 (collecting cases); *cf. Fleitmann v. Welsbach St. Lighting Co. of Am.*, 240 U.S. 27, 29 (1916) ("[W]e agree with the courts below that when a penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law.") (Holmes, J.); *United States v. Friedland*, 94 F. Supp. 721, 723 (D. Conn. 1950) ("[t]he assessment of treble damages, moreover, is penal . . .  and not the proper function of a court of equity" (citation omitted)).

The cases relied upon by BIC have not shown that treble damages were traditionally available in courts of equity.  *See* Dkt. No. 58 at 4.  First, BIC's reliance on *G.A. Modefine S.A. v. Burlington Coat Factory Warehouse Corp.*, 888 F. Supp. 44 (S.D.N.Y. 1995), is misplaced.

*Burlington* held that the plaintiffs' claim for "a statutory trebling of the profit award" did not trigger the Seventh Amendment right to a jury trial; the case, however, was decided before *Grupo Mexicano* and did not consider whether treble profits were traditionally available in a court of equity at the time of the Judiciary Act of 1789. *See* 888 F. Supp. at 46. The *Burlington* court based its determination on the language in the statute indicating that treble damages are mandatory unless *the court* finds extenuating circumstances. *Id.* (citing 15 U.S.C. § 1117(b)). This finding is distinguishable from the instant case, where the issue is whether, pursuant to *Grupo Mexicano*, such relief was traditionally accorded by courts of equity.

Similarly, BIC's reliance on *Penn Engineering & Manufacturing Corp. v. Peninsula Components, Inc.*, No. 19-513, 2024 WL 169659 (E.D. Pa. Jan. 16, 2024), is inapplicable. In *Penn Engineering*, the court noted in passing that the plaintiffs' demand for treble damages was "equitable in nature" because of the statutory language providing that "*the court shall*" award treble damages when the infraction was willful. 2024 WL 169659, at *1 n.2 (quoting 15 U.S.C. § 1117(b) (emphasis added)). The *Penn Engineering* court, however, stated that because treble damages in that context were "really a form of enhanced relief the Court may impose, such claims for treble damages are equitable." *Id.* The opinion—from a district court outside this Circuit— made no mention of *Grupo Mexicano* or whether an award of treble damages was traditionally available in courts of equity.

And even in the context of whether a defendant in an action brought under the Lanham Act is entitled to a jury trial, other courts have noted that damages in addition to profits under the Lanham Act, and particularly the trebling of a plaintiff's recovery, "largely serve retributive and deterrent purposes. That is why their award [of treble damages] is dependent on findings of . . . intentional counterfeiting, [a] quasi-criminal state[] of mind the determination of which has

historically been the particular province of the jury." *Gucci Am., Inc. v. Accents*, 994 F. Supp. 538, 540 (S.D.N.Y. 1998). "[B]oth before and after the enactment of the Seventh Amendment, the determination of similar remedies, such as punitive damages and multiple damages, were the province of courts of law, not courts of equity." *Id.* (citing *Curtis v. Loether,* 415 U.S. 189 (1974); *Ross v. Bernhard,* 396 U.S. 531 (1970)); *see also id.* (finding that "the threshold determination[] of intentional counterfeiting [under 15 U.S.C. § 1117(b)] . . . [is] for the jury").

Accordingly, as BIC has not pointed to anything to support the traditional availability of treble profits in courts of equity, the undersigned cannot conclude that such relief is equitable such that it may be considered in freezing assets to preserve a later award. The undersigned therefore respectfully recommends that the Court modify the Asset Freeze Order without trebled profits.

III. **Conclusion**

For the foregoing reasons, the undersigned respectfully recommends that the account freeze applying to Defendants' account at ██████████ be reduced from $140,934. The undersigned respectfully recommends that Defendants' account at ██████████ be frozen in the amount of $24,700, and that Defendants' assets and proceeds at ██████████ exceeding $24,700 be unfrozen.

Any objections to this Report and Recommendation must be filed within 14 days after service of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (d) (addressing computation of days). Any requests for an extension of time for filing objections must be directed to Judge Kovner. Failure to file objections within fourteen days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party

shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

The parties shall file a joint letter attaching targeted and narrowly tailored redactions (if any) to this Report and Recommendation by January 2, 2026.

Dated:        Brooklyn, New York
              December 29, 2025                **SO ORDERED.**

                                               ___/s/ Joseph A. Marutollo___
                                               JOSEPH A. MARUTOLLO
                                               United States Magistrate Judge